ORFINGER, J.,
concurring and concurring specially.
The unfortunate facts of this case compel us to confront a difficult question: is a fetus a “person” under Florida law?[1] “One can find no consensus on the issue among physicians, politicians, theologians, academics or judges.”[2] Few topics in American law have generated as much im *540 passioned debate as the status and rights, if any, of the unborn. “[W]hen there is a “potential life” at stake, the relationship between the right to decide and the right of government to intrude becomes far more emotional and complex.... Depending on one’s religious or philosophic views, life may begin anywhere from conception to ... birth.”[3]
The fetal rights debate began in earnest when the United States Supreme Court declared in Roe v. Wade, 410 U.S. 113, 157-58, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973), that a fetus is not a person for the purposes of the Fourteenth Amendment of the United States Constitution.[4] Florida, like most states, has followed the common law “born alive” rule when determining the rights, if any, of the unborn. Under that rule, the unborn generally have no legally recognized rights until, and unless, a live birth occurs. See generally State v. Ashley, 701 So.2d 338 (Fla.1997); Hernandez v. Garwood, 390 So.2d 357 (Fla.1980). American courts have also generally held that the words “person” or “human being,” as used in most statutes, do not include the unborn.[5] To some extent, that view has changed slightly in Florida. For example, the Florida Legislature has addressed the killing of an unborn child by enacting section 782.09, Florida Statutes (1988), which makes the willful killing of an “unborn quick child” unlawful. But with few exceptions, Florida statutes and case law have consistently maintained that there is no “person” with any rights, standing or entitlement until there is a live birth.[6]
As the majority opinion correctly observes, through the enactment of numerous statutes, the Florida Legislature has distinguished between the unborn and persons born alive. Consequently, although the State has a legitimate interest in protecting the “potentiality of human life,” an interest that becomes compelling once the unborn achieves viability, if the Legislature intends to depart from the traditional interpretation of the words “minor,” “person,” or “human being,” as those terms are used in the guardianship or other Florida Statutes, it must do so expressly, as such words generally apply to human life only postnatally. Roe, 410 U.S. at 157, 93 S.Ct. 705.
The Legislature is the appropriate forum to debate the proper balance between the State’s compelling interest in protecting the unborn and the mother’s constitutional right to privacy and personal bodily integrity, assuming that such a balance can be achieved. While the debate is typically framed in the context of the State’s right to interfere with a woman’s decision regarding an abortion, taking control of a woman’s body and supervising her conduct or lifestyle during pregnancy or forcing her to undergo medical treatment in order to protect the health of the fetus creates its own universe of troubling questions. Should the State have the authority to prohibit a pregnant woman from smoking cigarettes or drinking alcohol, both legal activities with recognized health risks to the unborn? Could the Legislature do so constitutionally given our supreme court’s *541 broad interpretation of Florida’s constitutional right of privacy and the limitations placed on the State’s ability to act by Roe?
While Wixtrom and the amici curiae supporting her position would limit this court’s ruling to situations involving a legally incompetent mother pregnant with a viable fetus, viewing' the problem through that narrow a lens distorts the real issue of the scope, if any, of fetal rights. If a fetus has rights, then all fetuses have rights. And, if a fetus is a person, then all fetuses are people, not just those residing in the womb of an incompetent mother. If we recognize a fetus as a person, we must accept that the unborn would have the rights guaranteed persons under the Constitutions of the United States and the State of Florida. While it is inviting to view this case as narrowly as Wixtrom suggests, it would be dangerous to do so when the potential for state intrusion into the lives of women is so significant. The Legislature, as the people’s elected representatives, must consider and weigh that delicate balance, consistent with constitutional limitations on the State’s ability to interfere with a pregnant woman’s right of privacy and bodily integrity.
Consistent with the holding in Roe v. Wade, the State has the authority to protect potential human life in the absence of a countervailing fundamental right or a more compelling state interest. At the same time, Roe recognized that the State’s compelling interest may be sacrificed to protect the life or health of the mother. Roe, 410 U.S. at 163-64, 93 S.Ct. 705. State regulation of fundamental rights is justified only by a compelling state interest. Id. at 156, 93 S.Ct. 705. Balancing the interests of the mother and the unborn is problematic, and, at least in the context of Florida guardianship law, has not yet been addressed by the Legislature. Whether the State can confer previously unrecognized rights on the unborn under Florida law is a question that we must leave to another day. Our conclusion here is simply that the Legislature has not yet done so, at least in the context of Florida guardianship law.
Our opinion should not be read to suggest that we believe that the Legislature can constitutionally grant rights to the unborn that might be in conflict with the mother’s right of privacy. Nor do we conclude that a viable fetus is not alive; rather, we hold that in the context of Florida guardianship law, the Legislature has not yet addressed the rights, if any, of the unborn, and when, if at all, a fetus acquires personhood, entitling it to the full protections of the law.[7] Whether the Legislature can confer rights on the unborn will be decided by the courts only if, and when, the Legislature enacts such legislation. But in doing so, the Legislature must consider the mother’s paramount right to privacy and bodily integrity. .
“Protecting the health "and welfare of potential life is both an important and altruistic enterprise; one that states can and, for the sake of humanitarianism, should undertake. However, in creating laws that advance fetal protections, states should take caution to ensure preservation of our society’s most sacred, and fundamental interests: privacy, personal liberty, and *542 bodily integrity.”[8]

. The terms "human being” and “person” are used herein interchangeably, as are the terms "unborn child” and "fetus.”

. William E. Buelow III, To Be And Not To Be: Inconsistencies in the Law Regarding the Legal Status of the Unborn Fetus, 71 Temp. L.Rev. 963, 963 (Winter 1998).

. Charlene Carres, Legislative Efforts to Limit State Reproductive Privacy Rights, 25 Fla. St. U.L.Rev. 273, 273 (Winter 1998).

. Aaron Wagner, Texas Two-Step: Serving Up Fetal Rights By Side-Stepping Roe v. Wade Has Set the Table for Another Showdown on Fetal Personhood in Texas and Beyond, 32 Tex. Tech L.Rev. 1085, 1090 (2001).

. Alan S. Wasserstrom, Homicide Based on Killing of Unborn Child, 64 A.L.R. 5th 671 (1998).

. Charlene Carres, Legislative Efforts to Limit State Reproductive Privacy Rights, 25 Fla. St. U.L.Rev. 273, 274 (Winter 1998).

. I do not suggest that in considering the welfare of an incapacitated pregnant woman, the guardianship court should ignore the well-being of the fetus. To the contrary, I believe the guardianship court has the authority and obligation to consider the fetus’s well-being, although the mother's life and health must trump concern for the welfare of the fetus, if those interests are irreconcilable. See Planned Parenthood of Southeastern Pa. v. Casey, 505 U.S. 833, 846, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992).

. Amy Kay Boatright, State Control Over the Bodies of Pregnant Women, 11 J. Contemp. Legal Issues 903, 903 (2001).